UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 08/15/2023
```

GLOBAL REFINING GROUP, INC.,

Plaintiff,

-against-

PMD ANALYSIS INC. a/k/a ANALYSE
PMD INC., et al.,

Defendants.

21-CV-0532 (JLR) (BCM)

ROBERT TURCOTTE d/b/a PREMIUM
CATALYTIC CONVERTER REFINING,

Plaintiff,

-against-

GLOBAL REFINING GROUP, INC.,

Defendant.

21-CV-9182 (JLR) (BCM)

**REPORT AND RECOMMENDATION
TO THE HON. JENNIFER L. ROCHON**

**BARBARA MOSES, United States Magistrate Judge.**

Global Refining Group, Inc. (Global), which is the plaintiff in No. 21-CV-0532 (the Global Action) and the defendant/counterclaimant in No. 21-CV-9182 (the Turcotte Action), is in the business of recycling catalytic converters, which it calls "Cats." *See* First Amended Complaint (FAC) (Dkt. 106) ¶¶ 1, 4, 15.[1] Cats are valuable on the scrap market because they contain the precious metals platinum, palladium, and rhodium, known as platinum-group metals (PGM). *Id.* ¶ 17. The scrap value of any particular Cat model depends largely on its PGM content (or "loadings"), which can be precisely determined only through an expensive testing process known as the "fire assay" process. *Id.* ¶¶ 18-20. Global has spent "over 5 years and more than ten million dollars" testing "an incredible number" of Cats to determine their PGM content, and developing a valuable database (the Database), which contains over 15,000 up-to-date assays, together with

_____

[1] All docket references are to the docket in the Global Action, No. 21-CV-0532, unless otherwise noted.

photographs of the corresponding Cat models (the Photos) and the Cats' "live market price." *Id.* ¶¶ 1, 24, 32, 35. Global makes the Database available to certain of its customers, subject to "strict licensing terms," through a mobile app called the Global Mobile App (the App). *Id.* ¶¶ 30-31.

Robert Turcotte, who is a defendant in the Global Action and the plaintiff/counterclaim defendant in the Turcotte Action, owns and operates a Cat recycling business known as Premium Catalytic Converter Refining, of which he is the sole proprietor. FAC ¶ 6. Additionally, he and his partner Monica Armstrong own and operate PMD Analysis Inc. a/k/a Analyse PMD Inc. (PMD). *See id.* ¶¶ 2, 5-6, 86; Amended Answer and Counterclaims (Countercl.) (No. 21-CV-9182, Dkt. 81) ¶¶ 2, 29.[2] Armstrong and PMD are defendants in the Global Action, but are not parties to the Turcotte Action.

Both the Global Action and the Turcotte Action arise of out a series of events that began in June 2020, when Turcotte entered into a Recycling Agreement under which he agreed to sell Cats to Global, thus making him a customer and allowing him – and Armstrong – to gain password-protected access to the App. Countercl. ¶¶ 31, 41-42, 44-45. Turcotte, Armstrong, and PMD (collectively, the Defendants) used that access to steal Global's confidential and proprietary information, doctor it, and post it to PMD's competing website (the Converter Database Website), along with the Photos, which Defendants also doctored (stripping Global's watermark and other labelling) in an effort to disguise their origin. FAC ¶¶ 44-75.

After it registered its copyrights for some of the Photos, Global brought suit in this District for violation of the Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836, *et seq.*; copyright infringement; contributory copyright infringement; common law trade secrets misappropriation;

---

[2] References to "Countercl. ¶ __" are to the paragraphs comprising Global's counterclaims, beginning on page 9 of the document.

unfair competition; breach of the Global Mobile Software Terms and Conditions (the App Agreement), which Global requires its customers to sign as a condition of gaining access to the App; and violation of the Digital Millennium Copyright Act (DMCA), 17 U.S.C. § 1201, *et seq.* Six weeks later, Turcotte brought his own action against Global in the Eastern District of Virginia, asserting claims for breach of the Recycling Agreement; account stated; and unjust enrichment. After the Turcotte Action was transferred to this District (where the two cases were designated related actions), Global asserted counterclaims for fraudulent inducement; breach of the App Agreement as "part of the Recycling Agreement"; breach of the duty of good faith and fair dealing implied into the Recycling Agreement; and unjust enrichment. Countercl. ¶¶ 51-89.

The parties vigorously litigated both actions for nearly two years, through discovery. But on October 26, 2022, counsel for Defendants withdrew (in both cases), after which Defendants refused to participate further in either case. In due course, Global obtained Certificates of Default against all three Defendants in the Global Action and against Turcotte in the Turcotte Action, and moved for a default judgment on its claims in the Global Action (Dkt. 155), for a default judgment on its counterclaims in the Turcotte Action (No. 21-CV-9182, Dkt. 98), and for an order dismissing Turcotte's claims in that action pursuant to Fed. R. Civ. P. 41(b), for failure to prosecute. (*Id.*)

For the reasons that follow, I respectfully recommend, as to the Global Action:

(i)     That Global's motion for a default judgment be granted;

(ii)    That judgment on Counts I and VII of the FAC (for breach of the DTSA and the DMCA, respectively) be entered in favor of Global and against all three Defendants;

(iii)   That Global be awarded $20,197,500 in statutory damages under the DMCA, together with post-judgment interest at the statutory rate;

(iv)    That a permanent injunction be entered against Defendants; and

(v)     That Global's remaining claims be dismissed.

I further recommend, as to the Turcotte Action:

(i)    That Global's motion for a default judgment on its counterclaims be denied, because it seeks no relief as to any of them;

(ii)    That Global's Rule 41(b) motion be granted; and therefore

(iii)    That all claims and counterclaims be dismissed.

# I.    BACKGROUND

## A.    Factual Background

### 1.    The Parties

Global is a Virginia corporation with its principal place of business in Kenbridge, Virginia, and a "partner" company, Alpha Recycling, Inc., located in the Bronx, New York. FAC ¶ 4. Global is "a leader in the field of recycling Cats and scrap metal, and is highly recognized in the local, national and global market." *Id.* ¶ 15.

Turcotte is a resident of Gatineau, Quebec, Canada, and does business under the trade name Premium Catalytic Converter Refining. FAC ¶¶ 5-6. Armstrong is also a resident of Gatineau, Quebec. *Id.* ¶ 7. PMD is a Canadian federal corporation with its principal place of business in Gatineau, Quebec. *Id.* ¶ 5. Turcotte and Armstrong are the directors of PMD, and Armstrong is "primarily responsible" for its "day-to-day operations." *Id.* ¶¶ 5, 7. Through PMD, Defendants "run, own and/or operate" the Converter Database Website at ww.converterdatabase.ca. *Id.* ¶ 8.

### 2.    Global's Operations

Global's business includes recycling Cats, which are "emission control devices that are commonly found in automobiles." FAC ¶ 16. Each Cat contains PGMs, which can be recovered by businesses that recycle them. *Id.* ¶ 17. A Cat's "value and recycling price depend on its PGM content," or "loadings," and the "most accurate method for determining the value of the PGM inside a Cat" is "a special testing process" called "fire assay," which "generally costs up to a

thousand or more dollars each" and destroys the Cat being tested. *Id.* ¶¶ 18-20. There is also a "less costly way of testing Cats," using XRF Analyzers, but this method is "less accurate than fire assay at pinpointing the PGM loadings of a Cat." *Id.* ¶ 21. Because Global "provides more accurate assay results than those used by competitors," its fire assay test results "provide a competitive advantage over other assay results." *Id.* ¶ 25.

Due to the cost of the fire assay process, most recycling companies lack the resources to use it for large-scale testing. FAC ¶ 22. Global, however, invested heavily in such testing. After five years of effort, and more than $10 million, Global developed its Database, which contains "an incredible number of assays from different models of Cats." *Id.* ¶ 24. "Global is not aware of another competitor who has tested as many Cats by fire assay and collected the information in a database, complete with photographs." *Id.* ¶ 22.

The Database gives Global "an advantage over its competitors, who do not know or use such information, or do not have access to such accurate information." FAC ¶ 93; *see also id.* ¶ 23 (the Database includes "nearly all Cats' PGM levels," and as such is "extremely valuable to Global, and provides a competitive advantage"). "Because [Global] has access to so many assays and is able to provide more accurate assay results, [Global] offers its customers . . . an impressive and trustworthy value for the PGM in any Cat." *Id.* ¶ 28. "In return, customers provide [Global] with more Cats to recycle, and [Global] is able to conduct more testing, and therefore collect more assay results and information." *Id.* ¶ 28. Moreover, "because customers want to gain access to [Global's Database], customers are more likely to conduct business with" it. *Id.* ¶ 101. "Owning a large and unparalleled database of assay results for Cats" is therefore "one of [Global's] business advantages." *Id.* ¶ 29.

### 3.    The Global Mobile App

One of the ways that Global uses its Database to its business advantage is through the App, launched in 2015. FAC ¶ 30. The App includes the "make, model, serial number, and nickname" of thousands of Cats, which customers can search (using any of these fields) to learn "the assay's details including associated converters and links to photos." *Id.* ¶ 34. Through the App, users can access "more than fifteen thousand up-to-date assays," and Global adds at least 250 new assays monthly. *Id.* ¶¶ 32-33. The App is updated every ten minutes to provide the "live market price" of the Cats in Global's Database. *Id.* ¶ 35.

The App is not available to the general public. Only "certain large-volume, existing customers" are granted access to the App, "subject to [Global's] strict licensing terms." FAC ¶ 31. "Access to the App requires special permission from [Global], who then assigns licensees a username log-in and password." *Id.* ¶ 40. Additionally, Global has implemented various "technical, administrative, and physical security measures to guard against unauthorized access, use and modification to systems where [Global] stores the electronic data comprising the Assay Information." *Id.* ¶ 41.[3] For example, it requires its employees to "maintain confidentiality of the Assay Information" and assigns them "unique passwords for their access thereto." *Id.* ¶ 42. Additionally, Global took pains to identify its ownership of the Photos, all of which (as displayed on the App), include "watermarks and unique 'sample numbers' assigned by [Global], containing the prefix 'GRG.'" *Id.* ¶ 43.

---

[3] "Assay Information" includes Cats' makes, models, serial numbers, and nicknames, plus "wet weights, dry weights, fire assay results, Cat prices calculated by converting the fire assay results into the PGM content in the Cats multiplied by the market value of the PGMs in the Cats, and price lists of Cats that vary according to geographic region and current market prices." FAC ¶ 39.

To access the App, a customer must agree to the App Agreement. FAC ¶ 44 & Ex. A (App Ag.) (Dkt. 106-1). The App Agreement "prohibits any user from using the App or the Global Website [at www.GlobalRefiningGroup.com] in any way which is 'unlawful, illegal, fraudulent, or harmful,'" *id.* ¶ 47 & App Ag. at 1; "prohibits any user from conducting any systematic or automated collection of data or information from the App," *id.* ¶ 48 & App Ag. at 1; "prohibits any user from republishing any data or information from the App (including republication on another website), or otherwise sharing [Global's] prices with competitors," *id.* ¶ 49 & App Ag. at 1; "prohibits any user from selling, renting, sub-licensing, or otherwise monetizing data or information from the Global Mobile App," *id.* ¶ 50 & App Ag. at 1; and "prohibits any user from reverse engineering, modifying, reproducing, duplicating, tampering with, redistributing, or copying [the] Global Mobile [App], or any information or data contained therein, except as expressly permitted by the Agreement." *Id.* ¶ 51 & App Ag. at 1.

### 4.    Defendants' Access to the App

On or around June 16, 2020, Global entered into the Recycling Agreement with Turcotte. Countercl. ¶ 41. "As a previous customer of Global, Turcotte knew that Global would grant him access to the Global Mobile App for the duration of the Recycling Agreement," *id.* ¶ 44, which it did, giving both Turcotte and Armstrong password-protected access to the App. *Id.* ¶ 45. According to Global, all three Defendants "expressly and voluntarily agreed to be bound" by the terms of the App Agreement. FAC ¶ 224.[4] Turcotte's intention, however – which he concealed from Global – was "to use the [Recycling] Agreement to gain access to the Assay Information and

---

[4] One of the three Defendants – Turcotte – so admits. *See* Ans. (Dkt. 125) ¶ 224 (admitting that, "in using the Global Mobile App, Turcotte agreed to the terms contained in its user agreement existing at the time").

Cat Photos found in the Global Mobile App" in order to "steal Global's proprietary Assay Information and Cat Photos and to harm Global in bad faith." Countercl. ¶¶ 42, 46.

Global "has never authorized Defendants, by license or otherwise, to copy, publish, distribute, or sell any Cat Photos, Assay Information, or PGM percentages derived from the Global Mobile App." FAC ¶ 71; *see also* Countercl. ¶ 32 (same).

### 5.    The Defendants' Converter Database Website

Defendants started developing their competing database, the Converter Database Website, in or around November 2018, and began "populating it with data in February 2019." FAC ¶ 72.[5] On or around August 17, 2020, Global "became aware that Defendants were marketing, republishing, using, selling, and distributing" approximately 8,000 of its Photos through the Converter Database Website. *Id.* ¶ 53. In order to hide the fact that the Photos belonged to Global, Defendants wiped Global's metadata and watermark from the Photos, removed the unique "GRG sample number and barcode" assigned to each Photo by Global, and superimposed PMD's website address onto the images. *Id.* ¶¶ 43, 74. The FAC includes four side-by-side examples of the misappropriated Photos. *Id.* ¶ 74. Each of Global's Photos shows a particular Cat model against a green and white backdrop that is prominently labeled "GLOBAL Refining Group," and includes a GRG sample number and barcode. Each corresponding image posted to the Converter Database Website is identical, except that the Global watermark and the GRG sample number and barcode are blacked out, and in many instances the Converter Database Website's address is superimposed on the image, as shown here:

---

[5] Global's pleadings do not specifically discuss the source of this initial data. In the Turcotte Action, however, Global alleges that even before entering into the 2020 Recycling Agreement, Turcotte "ha[d] been Global's customer since at least 2016," and in that capacity was "granted password protected access to [the] Global Mobile [App]." Countercl. ¶¶ 16-17.

**Defendant's photo on Infringing Website**          **Plaintiff's Cat Photo from App**



FAC ¶ 74.

In addition to copying and altering the Photos, Defendants "reverse engineered, and were marketing, republishing, using, selling, and distributing prices based on the corresponding Assay Information." FAC ¶ 54. Global explains that Defendants calculated the PGM content of "more than 10,750 Cats" in Global's Database by "isolating the dollar value of one PGM metal at a time and zeroing out the other values in the 'lock price' feature of the User Settings page" of the App. *Id.* ¶ 54. This allowed Defendants to derive the "PGM Percentages" for each Cat, at which point "all that they had to do was divide the market price for a PGM by that number to determine the current value of the PGM in a Cat." *Id.* ¶ 55. Thus, the Converter Database Website "lists the PGM Percentages for each Cat," based on Global's Assay Information. *Id.* ¶ 56. Defendants sold access to the Converter Database Website for $30 per month or $300 per year. *Id.* ¶ 75.

Because they were using Assay Information siphoned from the App, rather than performing their own tests, Defendants were able to add 2,700 new Cats to the Converter Database Website in November 2020 alone – all on the same date. FAC ¶¶ 63-64. By December 1, 2020, there were 10,780 Cats on the Converter Database Website. *Id.* ¶ 62. As further support for its claim that the data on Defendants' website was stolen, Global notes that "some of the Cats listed in the [Converter Database Website] mirror errors and mistakes from the Global Mobile App," including "mistaken

model numbers, missing manufacturers, and serial numbers as model numbers[.]" *Id.* ¶ 68. "These errors were detected by Global and fixed after Defendants were blocked from accessing [the] App . . . but the errors remain in the [Converter Database Website] to this date." *Id.* ¶ 69.

The PGM percentages offered on Defendants' website, however, were not identical to those on the App. In order to "create plausible deniability," as well as "lower prices that generate a greater profit margin with customers," Turcotte "changed the PGM percentages to be fractionally higher than the PGM Percentages in the Global Mobile App." FAC ¶ 59.

Global blocked Defendants from accessing the App, and sent a cease-and-desist letter, on January 4, 2021. FAC ¶ 69; Countercl. ¶ 39. Defendants took down their versions of the Photos "days later." FAC ¶ 90. However, as of the date of the FAC, Defendants "continue[d] to republish, distribute, use, and/or sell access to Assay Information" on their website. *Id.* ¶ 81. Moreover, Defendants "continue[d] to use their U.S.-based Facebook, Twitter, and LinkedIn accounts to market their competing business." *Id.* Because Defendants "active[ly] target[ed] U.S. customers, roughly 60% to 70% of [their] customers are located in the United States." *Id.* ¶ 82. Global alleges that Defendants' "unauthorized copying, use, publication, distribution, and sale of access to the Cat Photos and Assay Information" caused it to suffer "irreparable injury." *Id.* ¶ 83.[6]

### 6. Turcotte's and Global's Dispute Over the Recycling Agreement

Under the June 16, 2020 Recycling Agreement, *see* Turcotte Compl. (No. 21-CV-9182, Dkt. 1), Ex. 1 (Recycling Ag.) (No. 21-CV-9182, Dkt. 1-1), Turcotte was to deliver a certain number of catalytic converters, measured in pounds, Recycling Ag. §§ 1-4, and Global was to provide a preliminary advance payment, based on the weight of the shipment as delivered,

---

[6] As of the date of this Report and Recommendation, the Converter Database Website is "under construction." *See Converterdatabase.ca*, https://www.converterdatabase.ca/ (last visited August 15, 2023).

followed by a final payment "within one business day of supplier's settlement request." *Id.* § 5(a)-(b). In the Turcotte Action, Turcotte alleges that he shipped approximately 2,660 pounds of "scrap catalytic converters" to Global on or about December 21, 2020, which Global received on or about December 23, 2020. Turcotte Compl. ¶¶ 10, 11. On January 13, 2021, Turcotte "made a settlement request, which obligated Global to make full and final payment" within one business day, but Global did not do so. *Id.* ¶ 13. By invoice dated January 14, 2021, Global "acknowledged it owed [Turcotte] $343,801.28." *Id.* ¶ 14; *see also* Turcotte Compl. Ex. 2 (Invoice) (No. 21-CV-9182, Dkt. 1-2). Despite Turcotte's "request[ of] final payment" under the Recycling Agreement, Global has allegedly "refused to pay [Turcotte] pursuant to the terms of the [Recycling] Agreement." *Id.* ¶¶ 15-17.

Global admits that it entered into the Recycling Agreement, but alleges that it would not have done so had it known that Turcotte "was stealing Global's Assay Information and Cat Photos" and that he intended "to use the [Recycling] Agreement to gain access to the Assay Information and Cat Photos found in the Global Mobile App," thereby breaching the App Agreement. Countercl. ¶¶ 41-42, 46-47.

### B.    Global's Claims and Counterclaims

In the Global Action, Global alleges in Count I that Defendants misappropriated the Assay Information, in violation of the DTSA. FAC ¶¶ 91-137. Count II alleges that Defendants posted the Photos to their competing website without its authorization, in violation of the Copyright Act, 17 U.S.C. § 501, *id.* ¶¶ 138-65, and Count III alleges contributory copyright infringement. *Id.* ¶¶ 166-78. Count IV alleges common-law misappropriation of the Assay Information. *Id.* ¶¶ 179-211. Count V alleges that Defendants engaged in unfair competition and false promotion under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), by misrepresenting to the public that the Photos and Assay Information belonged to Defendants. *Id.* ¶¶ 212-22. In Count VI, Global alleges that

Defendants breached various provisions of the App Agreement when they collected, republished, and monetized the Photos and reverse-engineered the Assay Information. *Id.* ¶¶ 223-31. Lastly, in Count VII, Global alleges that Defendants violated the DMCA by altering the copyright management information (CMI) on the Photos when posting them on the Converter Database Website. *Id.* ¶¶ 232-41.

In the Turcotte Action, Global alleges in Counterclaim I that Turcotte fraudulently induced Global into entering the Recycling Agreement by deliberately concealing his theft and sale of Global's Assay Information and Photos to third parties at the time the parties entered into the Recycling Agreement. Countercl. ¶¶ 51-66. In Counterclaim II, it charges that Turcotte breached the App Agreement, "which he understood to be part of the Recycling Agreement." *Id.* ¶¶ 67-73. In Counterclaim III, Global alleges that Turcotte's conduct was in breach of the duty of good faith and fair dealing. *Id.* ¶¶ 74-86. Lastly, in Counterclaim IV, Global alleges that Turcotte was unjustly enriched by his use of the App. *Id.* ¶¶ 87-89.

### C.    Procedural Background

#### 1.    Global Action

Global commenced the Global Action on January 21, 2021, at which point it had registered its copyrights in 1,959 of the 8,079 Photos at issue. FAC ¶¶ 37, 141; *id.* Ex. C (Dkt. 106-3).[7] On March 26, 2021, Global moved for a preliminary injunction on its trade secrets misappropriation claim. (Dkt. 27.) The Hon. Gregory H. Woods, United States District Judge, denied the motion, ruling from the bench that Global "failed to adduce sufficient evidence that it will suffer imminent

---

[7] Global alleges that it owns the copyrights to all 8,079 Photos. FAC ¶¶ 1, 140, 168. The registrations became effective on various dates between December 1 and December 10, 2020. *See id.* Ex. C. The underlying works were first published on various dates between January 1, 2018, and September 30, 2020. *Id.*

and irreparable harm if injunctive relief does not issue." Transcript of Oct. 13, 2021 Hr'g (Dkt. 78) at 4:23-25. The Court made no finding as to probability of success. *Id.* at 13:4-6.

On November 5, 2021, Defendants moved for judgment on the pleadings (Dkt. 73) and, on December 2, 2021, Global moved to amend its complaint. (Dkt. 84.) On May 20, 2022, Judge Woods granted Global's motion for leave to amend and denied Defendants' motion for judgment on the pleadings. Transcript of May 20, 2022 Hr'g (Dkt. 112) at 26:21-22. Global filed its FAC on May 21, 2022. Meanwhile, the parties engaged in vigorous discovery, including depositions. *See generally* Global Action Mem. (Dkt. 156) at 4. On June 13, 2022, the parties stipulated to a bench trial (Dkt. 116), and on July 13, 2022, Defendants answered the FAC.

### 2.    Turcotte Action

Turcotte commenced the Turcotte Action against Global in the Eastern District of Virginia on March 3, 2021. On April 28, 2021, Global answered Turcotte's Complaint. (No. 21-CV-9182, Dkt. 6.) On May 28, 2021, Turcotte filed a pre-discovery motion for summary judgment. (No. 21-CV-9182, Dkt. 18.) Before deciding that motion, the Hon. Henry E. Hudson, United States District Judge, *sua sponte* ordered briefing regarding whether the matter should be transferred to this District. (No. 21-CV-9182, Dkt. 37.) On November 4, 2021, Judge Hudson transferred the case to this Court. *Turcotte v. Glob. Ref. Grp., Inc.*, 2021 WL 5149707, at *1 (E.D. Va. Nov. 4, 2021).

Once the Turcotte Action was received, it was designated as related to the Global Action and assigned to Judge Woods. After ordering supplemental briefing on Turcotte's motion for summary judgment (No. 21-CV-9182, Dkt. 49), Judge Woods denied the motion on February 24, 2022 (No. 21-CV-9182, Dkt. 58), explaining that it was "premature." Transcript of Feb. 24, 2022 Hr'g (No. 21-CV-9182, Dkt. 61) at 9:16. On July 14, 2022, Judge Woods noted the parties' agreement to a joint bench trial in both related cases, and scheduled that trial for February 13,

2023. (Dkt. 127; No. 21-CV-9182, Dkt. 74.) On September 16, 2022, Global amended its answer in the Turcotte Action to assert its counterclaims. Turcotte never responded to those counterclaims.

### 3.    Defendants' Default

On September 19, 2022, both cases were reassigned to the Hon. Jennifer L. Rochon, United States District Judge. (Dkt. 137; No. 21-CV-9182, Dkt. 82.) On October 4, 2022, Judge Rochon informed the parties that the joint trial would proceed as scheduled on February 13, 2023. (Dkt. 139; No. 21-CV-9182, Dkt. 84.) However, on October 12, 2022, Defendants' counsel moved for leave to withdraw in both cases, stating that their clients had stopped paying their bills or returning their phone calls. (Dkt. 140; No. 21-CV-9182, Dkt. 85.)

On October 13, 2022, Judge Rochon ordered Defendants to appear at a conference on October 25, 2022, concerning the withdrawal motion. (Dkt. 143; No. 21-CV-9182, Dkt. 88.) They failed to appear. Consequently, on October 26, 2022, the Court granted the withdrawal motions, ordered PMD to retain new counsel, and ordered Turcotte and Armstrong to retain new counsel or file a notice of *pro se* appearance no later than November 25, 2022. (Dkt. 144, at 1, 3; No. 21-CV-9182, Dkt. 89, at 1, 3.) However, PMD never retained new counsel and Turcotte and Armstrong never appeared *pro se*.

On December 6, 2022, Global filed a proposed certificate of default as to Defendants in the Global Action (Dkt. 149), and as to Turcotte in the Turcotte Action. (No. 21-CV-9182, Dkt. 92.) The next day, the Clerk of Court issued the Certificates. (Dkt. 151; No. 21-CV-9182, Dkt. 94.) On December 19, 2022, Judge Rochon issued a scheduling order for Global's anticipated default motions and adjourned the remaining case deadlines. (Dkt. 152; No. 21-CV-9182, Dkt. 95.)

On January 20, 2023, Global filed its motion for a default judgment against Defendants in the Global Action (Dkt. 155), supported by its memorandum of law, the Declaration of Global's Managing Partner Iga Vendetti, née Wolotowski (Vendetti Decl.) (Dkt. 158), and a proposed order,

which incorporates a proposed permanent injunction (Prop. Judgment) (Dkt. 159). On the same day, Global filed its motion for default judgment against Turcotte in the Turcotte Action, and to dismiss Turcotte's claims for failure to prosecute (No. 21-CV-9182, Dkt. 98), supported by a memorandum of law in support of the motion (Turcotte Action Mem.) (No. 21-CV-9182, Dkt. 99) and a proposed order. (No. 21-CV-9182, Dkt. 100.) Global contemporaneously served these papers on the defaulted parties by international mail. (Dkt. 160; No. 21-CV-9182, Dkt. 101.) The defaulted parties did not respond.

On March 1, 2023, Judge Rochon referred both motions to me for report and recommendation, as well as for an inquest into damages. (Dkt. 161; No. 21-CV-9182, Dkt. 102.) On March 21, 2023, I held a telephonic scheduling conference. (*See* Dkt. 162; No. 21-CV-9182, Dkt. 103.) Although Defendants were notified of the conference (*see* Dkt. 163; No. 21-CV-9182, Dkt. 104), only Global attended. After the conference, I issued an order requiring Global to make any motion for attorneys' fees no later than April 4, 2023, and to serve any such motion on the defaulted parties. (Dkt. 164; No. 21-CV-9182, Dkt. 105.) Global made a fee motion in the Global Action (Dkt. 165), but not in the Turcotte Action.[8]

### 4.    Global's Motions

In the Global Action, Global seeks a default judgment against all three Defendants on all seven of its claims. *See* Global Action Mem. at 9-19. However, the only relief it requests is statutory damages on Count VII (under the DMCA), *id.* at 22-25, and injunctive relief on Count I (under the DTSA). *Id.* at 19-22. Consequently, I consider only those two claims,[9] and conclude, as

---

[8] The fee motion has not, to date, been referred for report and recommendation.

[9] A judgment, by definition, grants "the relief to which each party is entitled." Fed. R. Civ. P. 54(c). Thus, on a motion for entry of a default judgment, there is no need for the court to consider any claim as to which the moving party seeks no relief. *See*, *e.g.*, *Travel Leaders Grp., LLC v. Corley*, 2019 WL 6647319, at *7 (S.D.N.Y. Dec. 5, 2019) ("plaintiffs request damages relating to their

detailed below, that Global should be awarded $20,197,500 in statutory damages on Count VII, against all Defendants, and injunctive relief on Count I.

In the Turcotte Action, Global seeks the entry of a default judgment on three of its counterclaims, as well as the dismissal of Turcotte's claims, pursuant to Rule 41(b), for failure to prosecute. *See* Turcotte Action Mem. at 2-13. The Rule 41(b) motion should be granted. However, since Global does not seek damages of any sort (even nominal damages), an injunction, a declaration, or any other relief on any of its counterclaims,[10] its motion for the entry of a default judgment as to those counterclaims should be denied. As a result, the entire action should be dismissed.

---

claims against defendants for violation of the Lanham Act, but not for the remaining causes of action . . . Therefore, in evaluating whether defendants have established a valid cause of action, the Court considers defendants' liability as to violation of the Lanham Act alone"), *report and recommendation adopted*, 2022 WL 950957 (S.D.N.Y. Mar. 30, 2022); *Shariff v. Alsaydi*, 2013 WL 4432218, at *3 (E.D.N.Y. Aug. 15, 2013) ("Plaintiff does not seek damages under the state or local Human Rights Laws, and I therefore do not consider liability under these statutes."); *Coach Servs., Inc. v. K Ya Int'l, Inc.*, 2010 WL 2771897, at *2 (S.D.N.Y. June 10, 2010) ("[T]he plaintiff has requested damages only for trademark infringements in violation of the Lanham Act, and therefore liability need only be considered with respect to that claim."), *report and recommendation adopted*, 2010 WL 2771907 (S.D.N.Y. July 12, 2010). In some cases, of course, a declaratory judgment may constitute the necessary relief. But Global did not request declaratory relief its operative pleading, *see* FAC at 36, and does not now seek a declaratory judgment, which in any event would not be available to it on default. *See* Fed. R. Civ. P. 54(c) ("A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings.").

[10] In its brief, Global lists the relief it seeks in the Turcotte Action: "(1) entry of default judgment on three of its counterclaims; (2) dismissal without prejudice of its fourth counterclaim for unjust enrichment pursuant to Rule 41(c) and (3) dismissal with prejudice of Plaintiff Robert Turcotte's claims pursuant to Rule 41(b) for his failure to prosecute his claims and disregard of this Court's orders." Turcotte Action Mem. at 1. Global explains that it "does not seek additional monetary or equitable relief for the counterclaims asserted here because it seeks monetary and equitable relief in the related case[.]" *Id.* at 1 n.2.

## II.    ANALYSIS

### A.    Legal Standards

Fed. R. Civ. P. 55 "provides a 'two-step process' for the entry of judgment against a party who fails to defend: first, the entry of a default, and second, the entry of a default judgment." *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 128 (2d Cir. 2011) (quoting *New York v. Green*, 420 F.3d 99, 104 (2d Cir. 2005)). The first step, ordinarily performed by a clerk, *see* Fed. R. Civ. P. 55(a), "formalizes a judicial recognition that a defendant has, through its failure to defend the action, admitted liability to the plaintiff." *Mickalis Pawn Shop*, 645 F.3d at 128. The second step, which in most cases requires a motion made to and granted by the district judge, *see* Fed. R. Civ. P. 55(b)(2), "converts the defendant's admission of liability into a final judgment that terminates the litigation and awards the plaintiff any relief to which the court decides it is entitled[.]" *Mickalis Pawn Shop*, 645 F.3d at 128.

"[A] default is an admission of all well-pleaded allegations against the defaulting party." *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 246 (2d Cir. 2004). Therefore, in considering a motion for the entry of judgment after default, the court must accept all well-pleaded factual allegations in the complaint as true, except those relating to damages. *Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009). However, a default "only establishes a defendant's liability if those allegations are sufficient to state a cause of action against the defendants." *Gesualdi v. Quadrozzi Equip. Leasing Corp.*, 629 F. App'x 111, 113 (2d Cir. 2015) (summary order). Thus, if "the well-pleaded factual allegations in the complaint fail to state a claim upon which relief can be granted, no damages can be awarded, even if the post-default inquest submissions supply the missing information." *Mondragon v. Keff*, 2019 WL 2551536, at *4 (S.D.N.Y. May 31, 2019) (collecting cases), *report and recommendation adopted*, 2019 WL 2544666 (S.D.N.Y. June 20, 2019). When assessing the sufficiency of a complaint for liability

17

purposes, the district court may consider documents "attached to the complaint, incorporated by reference, or integral to the complaint." *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 106 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 2679 (2022) (mem.).

"The entry of a default, while establishing liability, 'is not an admission of damages.'" *Mickalis Pawn Shop*, 645 F.3d at 128 (quoting *Finkel*, 577 F.3d at 83 n.6). Thus, "[e]ven in connection with a default judgment, the court has an obligation to ensure that damages are appropriate and determined with reasonable certainty." *Healing Power, Inc. v. Ace Cont'l Exports, Ltd.*, 2008 WL 4693246, at *5 (E.D.N.Y. Oct. 17, 2008). This means, among other things, that the damages sought must be recoverable under applicable law as a remedy for the defaulted claims, and (if actual damages are sought), the amount must be established with "reasonable certainty," *Gucci Am., Inc. v. Tyrrell-Miller*, 678 F. Supp. 2d 117, 121 (S.D.N.Y. 2008) (quoting *Langenberg v. Sofair*, 2006 WL 3518197, at *1 (S.D.N.Y. Dec. 7, 2006)), "based on admissible evidence." *House v. Kent Worldwide Mach. Works, Inc.*, 359 F. App'x 206, 207 (2d Cir. 2010) (summary order).

### B.    Jurisdiction

#### 1.    Subject Matter Jurisdiction

I am satisfied that this Court has subject matter jurisdiction over Global's claims and counterclaims. In the Global Action, subject matter jurisdiction is properly based on 28 U.S.C. § 1331 (federal question jurisdiction), 18 U.S.C. § 1836(b)(1) (DTSA jurisdiction), and 28 U.S.C. § 1338(a) (copyright jurisdiction). In the Turcotte Action, subject matter jurisdiction is properly based on 28 U.S.C. § 1332(a)(2) (diversity jurisdiction), as Turcotte is a "citizen[] or subject[] of a foreign state," while Global is a citizen of Virginia, and the amount in controversy exceeds $75,000. *See* Turcotte Compl. ¶ 3.

### 2. Personal Jurisdiction

"Personal jurisdiction is a necessary prerequisite to entry of a default judgment." *Sheldon v. Plot Commerce*, 2016 WL 5107072, at *6 (E.D.N.Y. Aug. 26, 2016), *report and recommendation adopted*, 2016 WL 5107058 (E.D.N.Y. Sept. 19, 2016). In the Global Action, personal jurisdiction over all three Defendants is premised on N.Y. C.P.L.R. § 302(a)(2), (conferring specific personal jurisdiction over a defendant who "commits a tortious act without the state causing injury to person or property within the state") and on the App Agreement, which names New York as the exclusive forum for "any disputes arising out of or relating to" that agreement. *See* FAC ¶¶ 11-13; App. Ag. at 2.

"It is well established that '[p]arties can consent to personal jurisdiction through forum-selection clauses in contractual agreements.'" *NuMSP, LLC v. St. Etienne*, 462 F. Supp. 3d 330, 342 (S.D.N.Y. 2020) (quoting *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 103 (2d Cir. 2006)). "Where an agreement contains a valid and enforceable forum selection clause, . . . it is not necessary to analyze jurisdiction under New York's long-arm statute or federal constitutional requirements of due process." *Gordian Grp., LLC v. Syringa Expl., Inc.*, 168 F. Supp. 3d 575, 581 (S.D.N.Y. 2016) (quoting *Exp.-Imp. Bank of U.S. v. Hi-Films S.A. de C.V.*, 2010 WL 3743826, at *4 (S.D.N.Y. Sept. 24, 2010)). Here, Defendants consented to be sued in this District when they agreed to the terms of the App Agreement. FAC ¶ 224.

Moreover, personal jurisdiction "may be waived or obviated by consent." *Grupke v. Linda Lori Sportswear, Inc.*, 174 F.R.D. 15, 18 (E.D.N.Y. 1997). In the Global Action, although Defendants pleaded lack of personal jurisdiction as a defense, *see* Ans. ¶ 242, they forfeited any jurisdictional challenge by moving for judgment on the pleadings, engaging in discovery, and otherwise litigating vigorously in this District for over two years – on the merits – before defaulting just a few months short of trial. *See Corporación Mexicana De Mantenimiento Integral, S. De R.L.*

*De C.V. v. Pemex-Exploración Y Producción*, 832 F.3d 92, 102 (2d Cir. 2016) (a defendant waives or forfeits a personal jurisdiction defense by "giv[ing] a plaintiff a reasonable expectation that it will defend the suit on the merits" or by "caus[ing] the court to go to some effort that would be wasted if personal jurisdiction is later found lacking") (quoting *Mobile Anesthesiologists Chicago, LLC v. Anesthesia Assocs. of Houston Metroplex, P.A.*, 623 F.3d 440, 443 (7th Cir. 2010)); *Roberts v. Bennaceur*, 658 F. App'x 611, 617-18 (2d Cir. 2016) (summary order) (defendants "forfeited their personal jurisdiction defense" by "participating in fairly extensive pre-trial proceedings, including discovery on the merits," while "[p]assing up" numerous opportunities to raise the defense); *Hamilton v. Atlas Turner, Inc.*, 197 F.3d 58, 60 (2d Cir. 1999) ("a delay in challenging personal jurisdiction by motion to dismiss may result in waiver, even where the defense was asserted in a timely answer") (cleaned up).

In the Turcotte Action, the question of personal jurisdiction is even simpler, because Turcotte is the plaintiff. "[A] plaintiff bringing suit in a forum 'submit[s] itself to the jurisdiction of the court with respect to all the issues embraced in the suit, including those pertaining to the counterclaim of the defendants.'" *V&A Collection, LLC v. Guzzini Props. Ltd.*, 46 F.4th 127, 132 (2d Cir. 2022) (quoting *Leman v. Krentler-Arnold Hinge Last Co.*, 284 U.S. 448, 451 (1932)); *see also Grupke*, 174 F.R.D. at 17 ("In the vast majority of cases a plaintiff, by virtue of bringing suit, waives venue and personal jurisdiction objections to a defendant's counterclaims.").

"This rule applies even if a case was transferred into the forum district, as is the situation here." *Gary Friedrich Enters., LLC v. Marvel Enters., Inc.*, 2011 WL 13262163, at *2 (S.D.N.Y. May 4, 2011); *see also Competitive Techs. v. Fujitsu Ltd.*, 286 F. Supp. 2d 1118, 1141-42 & n.17 (N.D. Cal. 2003) (finding that plaintiff waived objections to personal jurisdiction for counterclaims by continuing to prosecute after transfer of venue); *Grupke*, 174 F.R.D. at 19 (where plaintiffs

"continued to litigate in this court" after a § 1404 transfer, they "waived any objections to the court's exercise of personal jurisdiction to adjudicate claims ancillary to their own," including defendants' counterclaims). In the Turcotte Action, as in *Competitive Techs.* and *Grupke*, Turcotte continued to prosecute his affirmative claims against Global in this District after the transfer, thereby waiving any objections to this Court's assertion of personal jurisdiction over him on Global's counterclaims.

### C.    LIABILITY

#### 1.    DMCA

The DMCA "establishes a general prohibition against intentionally providing false copyright management information[.]" *Ward v. Nat'l Geographic Soc.*, 208 F. Supp. 2d 429, 449 (S.D.N.Y. 2002). As relevant here, the statute states:

> No person shall, without the authority of the copyright owner or the law–
>
> (1)    intentionally remove or alter any copyright management information,
>
> (2)    distribute . . . copyright management information knowing that the copyright management information has been removed or altered without authority of the copyright owner or the law, or
>
> (3)    distribute . . . copies of works . . . knowing that copyright management information has been removed or altered without authority of the copyright owner or the law,
>
> knowing, or, with respect to civil remedies under section 1203, having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement of any right under this title.

17 U.S.C. § 1202(b).

"Copyright management information (CMI) includes the name of and other identifying information about the author or copyright owner of a work, 'the information set forth on a notice of copyright,' the '[t]erms and conditions for use of the work,' and 'links to such information.'" *Reilly v. Plot Commerce*, 2016 WL 6837895, at *6 (S.D.N.Y. Oct. 31, 2016) (quoting 17 U.S.C.

§ 1202(c)(1)-(3), (6)-(7)). CMI also includes "[i]dentifying numbers or symbols referring to such information[.]" 17 U.S.C. § 1202(c)(7). "Thus, to establish a violation under § 1202(b)(1), a plaintiff must show '(1) the existence of CMI on the [infringed work]; (2) removal and/or alteration of that information; and (3) that the removal and/or alteration was done intentionally.'" *Ward v. Compound Ent. LLC*, 2020 WL 6136293, at *5 (S.D.N.Y. Apr. 27, 2020) (quoting *Banxcorp v. Costco Wholesale Corp.*, 723 F. Supp. 2d 596, 609 (S.D.N.Y. 2010)), *report and recommendation adopted*, 2020 WL 4496763 (S.D.N.Y. Aug. 3, 2020). The plaintiff must also establish that the removal or alteration "was done knowing that it would induce, enable, facilitate, or conceal an infringement." *Mango v. BuzzFeed, Inc.*, 356 F. Supp. 3d 368, 377 (S.D.N.Y. 2019), *aff'd*, 970 F.3d 167 (2d Cir. 2020). "[A] defendant's awareness that distributing copyrighted material without proper attribution of CMI will conceal *his own* infringing conduct satisfies the DMCA's second scienter requirement." *Mango*, 970 F.3d at 172 (emphasis in original).

Under the Copyright Act, "no civil action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made in accordance with this title." 17 U.S.C. § 411(a). However, most of the district courts that have considered the question – including courts in our Circuit – have concluded that claims under the DMCA are not "infringement" claims, and consequently are not subject to § 411(a). *See Recif Res., LLC v. Juniper Cap. Advisors, L.P.*, 2020 WL 5739138, at *11 (S.D. Tex. Sept. 24, 2020) ("A plain reading of the DMCA does not indicate that it is subject to the registration requirement found in 17 U.S.C. § 411(a)."); *ECIMOS, LLC v. Carrier Corp.*, 2018 WL 3589106, at *9 (W.D. Tenn. May 31, 2018) (collecting cases); *Gattoni v. Tibi, LLC*, 254 F. Supp. 3d 659, 663 (S.D.N.Y. 2017) (denying motion to dismiss DMCA claim for failure to register the underlying copyrights because failure to register "is not a bar to a DMCA action"); *Playboy Enters. Int'l Inc. v.*

*Mediatakeout.com LLC*, 2016 WL 1023321, at *5 (S.D.N.Y. Mar. 8, 2016) ("plaintiff's failure to register its copyrighted work is not a bar to a DMCA action") (quoting *I.M.S. Inquiry Mgmt. Sys., Ltd. v. Berkshire Info. Sys., Inc.*, 307 F. Supp. 2d 521, 531 n.9 (S.D.N.Y. 2004)).

The well-pleaded factual allegations in Global's FAC are sufficient to establish Defendants' liability under the DMCA for all 8,079 of the Photos that Defendants altered and then reposted to the Converter Database Website. Global created the Photos, each of which appeared on the App with a watermark, as well as a GRG sample number and barcode, that clearly identified Global as the "author or copyright owner" of that Photo, FAC ¶¶ 43, 233, thus constituting CMI for purposes of the DMCA.[11] Defendants, without authorization, copied 8,079 of Global's Photos from the App, removed their watermarks and GRG sample numbers by blacking them out, and "superimposed Defendants' website address onto the [P]hotos" before reposting the images on their own website. FAC ¶¶ 36, 74, 107, 234-36. These allegations, taken as true after default, establish the elements of a § 1202(b) violation, including that Defendants removed plaintiff's CMI intentionally, in violation of § 1202(b)(1), distributed false CMI, in violation of § 1202(b)(2), and distributed the Photos themselves with knowledge that their CMI had been removed and altered, in violation of § 1202(b)(3). *See Reilly*, 2016 WL 6837895, at *11 (after stripping the CMI, "[defendant] posted

---

[11] There is no allegation that Global used the word "copyright" or the symbol "©" on the Photos themselves. Nor is there any such requirement under the DMCA. *See Mango*, 970 F.3d at 169-70, 172-73 ("gutter credit," consisting of photographer's name printed below his photo, constitutes CMI for purposes of the DMCA); *Reiffer v. NYC Luxury Limousine Ltd.*, 2023 WL 4029400, at *8 (S.D.N.Y. June 15, 2023) (defendant violated DMCA when it removed "CMI consisting of Mr. Reiffer's name" from Reiffer's photograph before reposting the image, without permission, to its own website); *Michael Grecco Prods., Inc. v. Alamy, Inc.*, 372 F. Supp. 3d 131, 138 (E.D.N.Y. 2019) (watermarks "constitute CMI for the purpose of stating a violation of § 1202(a)"). Here, the name "GLOBAL Refining Group" was prominently displayed in the backdrop of each Photo, and also appeared, under the image of the Cat, on the label containing the GRG sample number and barcode. *See* FAC ¶ 74. As in *Reiffer* and *Michael Grecco Prods.*, these clear indicia of authorship and copyright ownership constituted protectible CMI under the DMCA.

the altered image to [its] Website, thereby distributing a work with the knowledge that its CMI was removed in violation of subsection 1202(b)(3)"). Moreover, the lengths to which Defendants went to obliterate all references to Global on the Photos supports the conclusion that they knew that the removal of Global's CMI would "enable, facilitate, [and] conceal" their own infringement. *Ward*, 2020 WL 6136293, at *5.

### 2. DTSA

Under the DTSA, the term "trade secret" is defined as:

[A]ll forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if–

(A)    the owner thereof has taken reasonable measures to keep such information secret; and

(B)    the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]

18 U.S.C. § 1839(3). "[A] trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectible secret." *Town & Country Linen Corp. v. Ingenious Designs LLC*, 556 F. Supp. 3d 222, 276 (S.D.N.Y. 2021) (quoting *Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 174 (2d Cir. 1990)), *reconsideration denied*, 2021 WL 4892857 (S.D.N.Y. Oct. 19, 2021); *see also Catalyst Advisors, L.P. v. Catalyst Advisors Invs. Glob. Inc.*, 602 F. Supp. 3d 663, 675 (S.D.N.Y. 2022) ("Given the legwork Plaintiff claims to have put into identifying the

candidates on the Candidate List . . . , Plaintiff has adequately alleged that this list merits trade secret protection.").

The "reasonable measures" necessary to satisfy § 1839(3)(B) may include the use of "computer and software passwords," as well as "confidentiality agreements and non-disclosure agreements" that must be executed before the trade secrets are revealed. *Espire Ads LLC v. TAPP Influencers Corp.*, 2023 WL 1968025, at *10 (S.D.N.Y. Feb. 13, 2023); *see also ExpertConnect, L.L.C. v. Fowler*, 2019 WL 3004161, at *4 (S.D.N.Y. July 10, 2019) (plaintiff took reasonable measures to protect its trade secrets when it "required its employees to enter into NDAs," made the material accessible only through "password protected entry points," and prohibited employees from "misus[ing], or remov[ing]" its confidential information "without authorization") (alteration in original).

As relevant here, the DTSA defines "misappropriation" to include:

(A)    acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(B)    disclosure or use of a trade secret of another without express or implied consent by a person who–

    (i)    used improper means to acquire knowledge of the trade secret; [or]

    (ii)    at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was–

        (I)    derived from or through a person who had used improper means to acquire the trade secret;

        (II)    acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or

        (III)    derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret[.]

18 U.S.C. § 1839(5); *see also Uni-Sys., LLC v. United States Tennis Ass'n, Inc.*, 350 F. Supp. 3d 143, 171 (E.D.N.Y. 2018) (to establish a claim of misappropriation of a trade secret, under the DTSA, "a plaintiff must show that the trade secret was: (A) acquired by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosed by another without express or implied consent.") (citing 18 U.S.C. § 1839(5)(A), (B)); *ExpertConnect*, 2019 WL 3004161, at *6 ("Under the DTSA, a complaint must plead that the defendant misappropriated a trade secret (1) by acquiring a trade secret by improper means, or (2) [by] disclosing or using the trade secret without consent.") (quoting *AUA Priv. Equity Partners, LLC v. Soto*, 2018 WL 1684339, at *4 (S.D.N.Y. Apr. 5, 2018)).

Here, Global has adequately pled that its Database – including its Assay Information – constitutes a "compilation" of information that it developed at considerable expense, *see* FAC ¶¶ 24-25, 93, 97, and that provides value to Global precisely because the information it compiled (particularly in the user-friendly form of the App) is not generally known to or accessible by its competitors or the public. *See id.* ¶¶ 25, 29, 93-94, 98, 101-02. Global has also demonstrated, through its pleading, that it took reasonable measures to keep its Database secret by, *inter alia*, limiting access to the data by contract and password. *See id.* ¶¶ 31, 40-44, 48-51, 95-96; App Ag. at 1 (prohibiting users from republishing "any data or information" from the App and requiring users to keep their usernames and passwords confidential).

Global has also pled facts that – taken as true – show that Defendants misappropriated the Assay Information, in that they acquired it "under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret," and then disclosed it "without express or implied consent" by Global. 18 U.S.C. § 1839(5)(B)(ii)(II). Not only did Defendants lack consent for their conduct; it was in clear violation of the App Agreement to which they

"expressly and voluntarily agreed to be bound." FAC ¶ 224.[12] Even if only Turcotte entered into the App Agreement, as Defendants insist, *see* Ans. ¶ 224, his business partner Armstrong would not escape liability, because she too required a Global-issued username and password to access the Assay Information, *see* Countercl. ¶ 45, and hence "knew or had reason to know" that her knowledge of Global's trade secrets was "derived from or through a person," namely, Turcotte, "who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret." 18 U.S.C. § 1839(5)(B)(ii)(III). And since defendant PMD, which charged $30 per month (or $300 per year) for access to Global's Assay Information, was "under the ownership, direction and control of Turcotte and Armstrong," FAC ¶ 12, its liability is coterminous with that of its owners and operators.[13]

---

[12] Under the App Agreement, the App "may only be used by a current Global Customer." App Ag. at 1. Moreover, users were not permitted to "conduct any systematic or automated collection of data or information from Global Mobile;" to "republish any data or information from Global Mobile (including republication on another website), or otherwise share our prices with competitors;" to "sell, rent, sub-license, or otherwise monetize data or information from Global Mobile;" or to "reverse engineer, modify, reproduce, duplicate, tamper with, redistribute, or copy Global Mobile, or any information or data contained therein, except as expressly permitted by this Agreement." *Id.*

[13] Global argues that it has also pled misappropriation under the "improper means" branch of the statute, *see* 18 U.S.C. § 1839(5)(A), because Defendants entered into the App Agreement for the improper purpose "of appropriating Global's proprietary information for use in Defendants' competing business." Global Action Mem. at 11 (citing FAC ¶¶ 53, 72-76, 105, 214, 217); *see also* 18 U.S.C. § 1839(6)(A) ("Improper means" includes, *inter alia*, "misrepresentation"). However, the cases on which Global relies for this point involve employees who downloaded (or uploaded) their employers' trade secrets to their personal devices or accounts, thereby breaching their contractual obligations to those employers at the moment of the acquisition. *See ExpertConnect*, 2019 WL 3004161, at *6 (Fowler acquired her employer's trade secrets by improper means when she "downloaded a document regarding an acquisition proposal" in violation of her NDA); *AUA Priv. Equity Partners*, 2018 WL 1684339, at *7 (Soto acquired her employer's trade secrets "by improper means" when she uploaded them "from her work laptop to her personal cloud-based storage without AUA's permission and in direct violation of the confidentiality agreements that she signed"). Here, although Defendants allegedly had an ulterior motive for gaining access to the App, there is no allegation that they violated any contractual – or statutory – duties to Global until they improperly *used* and *disclosed* its trade secrets by posting them to their own competing website.

###### D.    Damages Under the DMCA

A person who violates the DMCA is liable for either "the actual damages and any additional profits of the violator," or "statutory damages," 17 U.S.C. § 1203(c)(1)(A)-(B), at the election of the complaining party. *Id.* § 1203(c)(3). For "each violation" of § 1202, statutory damages may be awarded "in the sum of not less than $2,500 or more than $25,000." *Id.* § 1203(c)(3)(B). "'[E]ach act of removal and each act of addition' can be a separate violation of the DMCA." *Reilly*, 2016 WL 6837895, at *11.

Here, Global has elected statutory damages, which are "especially fitting in the default judgment context[.]" *Bus. Casual Holdings, LLC v. TV-Novosti*, 2023 WL 1809707, at *10 (S.D.N.Y. Feb. 8, 2023) (quoting *Tu v. TAD Sys. Tech., Inc.*, 2009 WL 2905780, at *2 (E.D.N.Y. Sept. 10, 2009)), *report and recommendation adopted*, 2023 WL 4267590 (S.D.N.Y. June 28, 2023); *accord Pires v. UOB Holdings (USA) Inc.*, 2022 WL 902464, at *5 (S.D.N.Y. Mar. 28, 2022). In its brief, Global asks for damages "at a rate of $5,000 per DMCA violation," Global Action Mem. at 23, and counts 8,079 DMCA violations, corresponding to "the removal and/or alteration by Defendants of CMI from 8,079 photos of CATS." *Id.* at 22-23. Acknowledging that the requested award (totaling $40,395,000) is "higher than in other DMCA cases," *id.* at 24, Global argues that it is nonetheless just because Defendants "knowingly committed so many DMCA violations," and deliberately tampered with the Photos "to pass them off as [their] own for a period of approximately two years[.]" *Id.* at 24-25. Additionally, Global contends, a substantial sum is necessary to serve the twin purposes of statutory damage awards, "compensatory and punitive." *Id.* at 23 (quoting *Miller v. Netventure24 LLC*, 2021 WL 3934262, at *7 (S.D.N.Y. Aug. 6, 2021), *report and recommendation adopted*, 2021 WL 3931928 (S.D.N.Y. Sept. 2, 2021)).

"A court has 'wide discretion' in setting the statutory damage award" under the DMCA. *Advanced Access Content Sys. Licensing Adm'r, LLC v. Shen*, 2019 WL 2450495, at *9 (S.D.N.Y.

Mar. 13, 2019) (quoting *Island Software & Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 265 (2d Cir. 2005)), *report and recommendation adopted*, 2023 WL 4348030 (S.D.N.Y. July 5, 2023). In exercising its discretion, the court properly considers "a number of factors," including "the difficulty of proving actual damages, the circumstances of the violation, whether [d]efendants violated the DMCA intentionally or innocently, and deterrence." *Reiffer*, 2023 WL 4029400, at *10 (quoting *Myeress v. Elite Travel Grp. USA*, 2018 WL 5961424, at *4 (S.D.N.Y. Nov. 14, 2018)). "Courts in this district often award the minimum figure where . . . there is little or no evidence to show that the DMCA violation increased the actual injury to the plaintiff, and the damages submission is 'bare-boned.'" *Netventure24*, 2021 WL 3934262, at *8 (quoting *Jerstad v. New York Vintners LLC*, 2019 WL 6769431, at *4 (S.D.N.Y. Dec. 12, 2019)); *see also Warner Bros. v. Dae Rim Trading, Inc.*, 677 F. Supp. 740, 769 (S.D.N.Y. 1988) (statutory damages should not provide the plaintiff with a "windfall recovery" untethered to the quantum of actual harm caused by the misconduct).

Conversely, where a defendant's conduct is "willful and even duplicitous," and was not an isolated act, "the goal of deterring such conduct[] further supports a significant statutory damages award[.]" *Bus. Casual Holdings*, 2023 WL 1809707, at *11. In those cases, "[s]tatutory damages . . . should be substantial enough to deter both the Defendant and others who may be inclined to engage in similar conduct." *Id.* (collecting cases). In considering the deterrent value of an award, the court should keep in mind not just the per-violation award but the impact of the judgment as a whole. *See*, *e.g.*, *Arista Recs. LLC v. Usenet.com, Inc.*, 2010 WL 3629688, at *9 (S.D.N.Y. Feb. 2, 2010) (considering the impact on defendants in assessing total award of statutory damages for copyright infringement), *report and recommendation adopted*, 2010 WL 3629587 (S.D.N.Y. Sept. 16, 2010).

Global is correct that it is entitled to statutory damages for 8,079 violations of § 1202. *Reilly*, 2016 WL 6837895, at *11; *see also Johnson v. Tennyson*, 2023 WL 2747025, at *6 (S.D.N.Y. Mar. 8, 2023) (recommending a separate statutory damages award for "each of seven DMCA violations" where defendants distributed seven "paint kits" based on plaintiff's copyrighted photographs, but "bearing Tennyson's signature and/or conveyed with APP's name, logo and/or website address"). Global clearly alleges that Defendants copied 8,079 of its Photos, and as to each, "wiped out Plaintiff's metadata and watermark logo," and "superimposed Defendants' website address onto the photos, while removing the GRG sample number and barcode." FAC ¶ 234. These allegations, taken as true after default, establish *at least* 8,079 violations of the DMCA. *Cf. Sheldon*, 2016 WL 5107072, at *16 (awarding statutory damages for "20 violations" of the DMCA where plaintiff's metadata was removed from "all eleven reproductions of the Photograph" and defendant's logo was "added to nine of the eleven reproductions").[14]

---

[14] Under the Copyright Act, 17 U.S.C. § 412(2), a plaintiff may not recover statutory damages pursuant to § 504 (or attorneys' fees pursuant to § 505) for any "infringement of copyright" that was "commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the work." "Courts in this district have held that Section 412 of the Copyright Act imposes a bright-line rule that precludes recovery of statutory damages and attorneys' fees where the first act of infringement in a series of ongoing infringements occurred prior to the work's copyright registration." *Solid Oak Sketches, LLC v. 2K Games, Inc.*, 2016 WL 4126543, at *2 (S.D.N.Y. Aug. 2, 2016). As noted above, Global did not register any of its copyrights until after well after Defendants' infringement began, and as of the date of its operative pleading had only registered 1,959. *See* FAC ¶¶ 37, 141; *id.* Ex. C. However, Global does not seek statutory damages under § 504. Rather, it seeks such damages under § 1203(c)(3)(B), which is not subject to the bar of § 412. *See Shihab v. Complex Media, Inc.*, 2022 WL 3544149, at *7-9 (S.D.N.Y. Aug. 17, 2022) (rejecting contention that "the section 412 bar applies to all copyright claims," including those under § 1202, and concluding that "section 412 does not preclude Shihab's claim for an award of statutory damages, attorney's fees and costs under section 1203 for his DMCA violation claim," even though the works at issue were not timely registered); *accord Bus. Casual Holdings*, 2023 WL 1809707, at *14 ("the relative timing of publication, registration and infringement does not come into play in determining whether an award of attorney's fees should be made for Defendant's DMCA violations"); *Recif Res., LLC*, 2020 WL 5739138, at *11 ("[A] plain reading of § 412 'demonstrates that the statute applies only to statutory damages and attorney's fees sought under Sections 504 and 505. Section

However, I recommend that damages be assessed at the rate of $2,500 per violation – rather than $5,000, as defendants request – for a total of $20,197,500. Although Defendant's conduct was both willful and protracted, warranting "a significant statutory damages award," *Bus. Casual Holdings*, 2023 WL 1809707, at *11, they took down the Photos within days of receiving the January 4, 2021 cease-and-desist letter, FAC ¶ 90, and there is no suggestion in the record of any further DMCA violations since that date. Moreover, Global has submitted no admissible evidence demonstrating that it suffered any actual damages as a result of Defendants' DMCA violations. In her post-default declaration, Vendetti states in the broadest possible terms that "the harm to Global has been significant and is ongoing," Vendetti Decl. ¶ 15, but offers no description of that harm (for example, lost customers or decreased revenue), much less any calculation or estimate of the actual economic injury, if any, inflicted by Defendants' theft and misuse of the Photos. Where, as here, the plaintiff makes "no effort to show what actual damages, if any, [it] suffered as a result of the DMCA violation," statutory damages "at the lowest end of the range" are appropriate. *Netventure24*, 2021 WL 3934262, at *8 (recommending $10,000 in statutory damages for four DMCA violations); *see also Jerstad*, 2019 WL 6769431, at *4 ($2,500 award for single violation was fair where plaintiff "has not made much of an effort to support a damages figure"); *Romanowicz v. Alister & Paine, Inc.*, 2018 WL 4762980, at *6 (S.D.N.Y. Aug. 3, 2018) ($2,500 award for single violation where "Plaintiff's submissions supporting his request for statutory damages are bare-boned at best"), *report and recommendation adopted*, 2018 WL 4759768 (S.D.N.Y. Oct. 1, 2018). I note as well that even at "the lowest end of the range," the overall award mandated by the DMCA for 8,079 violations is over $20 million, which (if collectible) would

---

412 says nothing about registration prior to the infringement as a prerequisite of receiving statutory damages and attorney's fees sought under Section 1203.") (quoting *Design Ideas, Ltd. v. Meijer, Inc.*, 2018 WL 3545157, *10 (C.D. Ill. July 23, 2018)).

likely be a windfall for Global, and is certainly sufficient to deter Defendants (and others) from future DMCA violations. I thus conclude that the twin goals of statutory damages – compensation and deterrence – will be amply met, in this case, by an award of $2,500 per violation.

Global does not seek any pre-judgment interest. *See* Global Action Mem. at 1, 25. It does seek post-judgment interest, *id.*, to which it will be entitled "at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding[] the date of the judgment." 28 U.S.C. § 1961(a).

### E.    Injunctive Relief

"A court may issue an injunction on a motion for default judgment provided that the moving party shows that (1) it is entitled to injunctive relief under the applicable statute and (2) it meets the prerequisites for the issuance of an injunction." *Wealth Mgmt. Assocs. LLC v. Farrad*, 2019 WL 5725044, at *5 (S.D.N.Y. June 21, 2019) (quoting *Hounddog Prods., L.L.C. v. Empire Film Grp., Inc.*, 826 F. Supp. 2d 619, 632 (S.D.N.Y. 2011)), *report and recommendation adopted*, 2019 WL 6497424 (S.D.N.Y. Dec. 3, 2019). Here, Global seeks injunctive relief pursuant to the DTSA, *see* Global Action Mem. at 19-22, which allows the Court to "grant an injunction . . . to prevent any actual or threatened misappropriation . . . on such terms as the court deems reasonable[.]" 18 U.S.C. § 1836(b)(3)(A)(i); *see also Syntel Sterling Best Shores Mauritius Ltd. v. The TriZetto Grp., Inc.*, 68 F.4th 792, 808 (2d Cir. 2023) ("the DTSA empowers a federal court to grant an injunction to prevent actual or threatened misappropriation of trade secrets").

To demonstrate that it is entitled to injunctive relief, the moving party must satisfy four requirements:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*Hermès Int'l v. Rothschild*, 2023 WL 4145518, at *7 (S.D.N.Y. June 23, 2023) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)). Injunctive relief must, however, be "narrowly tailored to fit specific legal violations" and avoid "unnecessary burdens on lawful commercial activity." *KCG Holdings, Inc. v. Khandekar*, 2020 WL 1189302, at *17 (S.D.N.Y. Mar. 12, 2020) (quoting *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 119 (2d Cir. 2009)) (cleaned up). An injunction "is overbroad when it seeks to restrain the defendants from engaging in legal conduct, or from engaging in illegal conduct that was not fairly the subject of litigation." *Fresh Del Monte Produce Inc. v. Del Monte Foods Co.*, 933 F. Supp. 2d 655, 662 (S.D.N.Y. 2013) (quoting *Mickalis Pawn Shop*, 645 F.3d at 145). "Plaintiff bears the burden of showing 'why the *specific* relief it requests is appropriately tailored and does not impose an undue hardship.'" *Smart Team Glob. LLC v. HumbleTech LLC*, 2022 WL 847301, at *12 (S.D.N.Y. Feb. 18, 2022) (quoting *KCG Holdings*, 2020 WL 1189302, at *18) (emphasis in original), *report and recommendation adopted*, 2022 WL 846927 (S.D.N.Y. Mar. 22, 2022).

Here, Global has adequately pled that it has suffered an irreparable injury as a result of Defendants' misappropriation of its Assay Information. Although Defendants took down the Photos, they "continue[d] to republish, distribute, use, and/or sell access to Assay Information" on their website. FAC ¶ 81; *see also* Vendetti Decl. ¶ 15 (as of January 19, 2023, the Assay Information "continues to be accessible on [Defendants'] website. The longer it remains there, the uniqueness of the information on Global's App continues to be diminished and Global's competitive edge continues to be dulled."). Additionally, Defendants "continue[d] to use their U.S.-based Facebook, Twitter, and LinkedIn accounts to market their competing business," FAC ¶ 81, and in so doing actively targeted U.S. customers, for whom they compete with Global. *Id.* ¶ 82. These allegations and attestation also support Global's claim that the remedies available at

law cannot adequately compensate for the theft and misuse of its trade secrets. *See IDG USA, LLC v. Schupp*, 416 F. App'x 86, 88 (2d Cir. 2011) (summary order) (affirming district court order concluding that plaintiff "satisfied the irreparable harm requirement and that a preliminary injunction was justified" by showing that defendant disseminated plaintiff's trade secrets to customers and competitors); *Intertek Testing Servs., N.A., Inc. v. Pennisi*, 443 F. Supp. 3d 303, 331 (E.D.N.Y. 2020) (granting injunction where individual defendants "were disseminating [plaintiff's] trade secrets to one of its competitors").

I have also considered the balance of hardships between Global and Defendants. A narrowly-tailored injunction, which would in effect require Defendants to honor the agreement they made when they were given access to the Assay Information, will do them no appreciable harm and – importantly – will leave them free to compete with Global, so long as they do so based upon their own efforts or upon publicly-available information. Nor would such an injunction disserve the public interest.

Global seeks an injunction prohibiting Defendants, and all those acting in concert or participation with them, "including Internet Service Providers ('ISPs')," from:

> continuing to use, sell, operate, reverse-engineer, or employ any intellectual property, confidential information, proprietary information, or trade secret of [Global], including on the www.converterdatabase.ca website and/or any and all social media websites or accounts, including but not limited to Facebook, Twitter and LinkedIn, associated with or used by any of [PMD's Turcotte's and Armstrong's affiliates][.]

Prop. Judgment at 2-3. Global also seeks to prohibit the enjoined parties from:

> operating, advertising, marketing and/or hosting websites or social media accounts that are involved with the distribution, use or promotion of information and data obtained, modified, reproduced and/or derived from Global's Mobile App[.]

*Id.* at 3.

As written, these provisions are too vague to be enforceable, particularly insofar as they would prohibit both Defendants and non-party ISPs, on penalty of contempt, from hosting websites or social media accounts "involved with" the distribution, use, or promotion of information or data "derived from" the App. A better approach, on the facts of this case (particularly since Defendants' website appears to be defunct at present), would be an injunction that mirrors the terms of the App Agreement. Consequently, Defendants and those acting in concert with them should be permanently enjoined and restrained from collecting, reverse-engineering, copying, duplicating, sharing, re-posting, republishing (including to any website or social media account), or otherwise disseminating, whether in its original form or in a modified form, any data, information, or images obtained or derived from plaintiff's website or from the App.

### F.    Dismissal

District courts are authorized to dismiss an action "[i]f the plaintiff fails to prosecute or to comply with [the federal] rules or a court order." Fed. R. Civ. P. 41(b). Because Rule 41(b) dismissal is "a harsh remedy to be utilized only in extreme situations," *LeSane v. Hall's Sec. Analyst, Inc.*, 239 F.3d 206, 209 (2d Cir. 2001) (quoting *Theilmann v. Rutland Hosp., Inc.*, 455 F.2d 853, 855 (2d Cir. 1972) (per curiam)), a district court considering such a dismissal must weigh the following five factors:

> (1) the duration of the plaintiff's failure to comply with the court order, (2) whether plaintiff was on notice that failure to comply would result in dismissal, (3) whether the defendants are likely to be prejudiced by further delay in the proceedings, (4) a balancing of the court's interest in managing its docket with the plaintiff's interest in receiving a fair chance to be heard, and (5) whether the judge has adequately considered a sanction less drastic than dismissal.

*Baptiste v. Sommers*, 768 F.3d 212, 216 (2d Cir. 2014) (quoting *Lucas v. Miles*, 84 F.3d 532, 535 (2d Cir. 1996)). No single factor is dispositive. *Id.* (internal citation omitted); *Shannon v. Gen. Elec. Co.*, 186 F.3d 186, 194 (2d Cir. 1999).

"With regard to the first factor, the Court should consider '(1) whether the failures to prosecute were those of the plaintiff; and (2) whether these failures were of significant duration.'" *J&J Sports Prods., Inc. v. Patin*, 2023 WL 4406169, at *1 (S.D.N.Y. July 7, 2023) (quoting *Martens v. Thomann*, 273 F.3d 159, 180 (2d Cir. 2001)). As to the third factor, even when "there is no specific evidence on the record that delay will prejudice Defendants, 'prejudice to defendants resulting from unreasonable delay may be presumed.'" *Cannon v. New York State Dep't of Corr. & Cmty. Supervision*, 2023 WL 4157173, at *1 (S.D.N.Y. June 23, 2023) (quoting *Labib v. Citigroup Glob. Mkts. Holdings, Inc.*, 2022 WL 1032560, at *3-4 (S.D.N.Y. Apr. 4, 2022)) (cleaned up). "The fourth factor requires the Court to balance its own interest in managing its docket with [the plaintiff]'s interest in receiving a fair chance to be heard." *J&J Sports Prods., Inc.*, 2023 WL 4406169, at *2. "In this regard, courts distinguish between failures to prosecute based on vexatious and burdensome conduct versus 'silent unobtrusive' failures to prosecute in which the plaintiff simply does not file the requisite papers." *Pena v. Zazzle Inc.*, 587 F. Supp. 3d 109, 114, (S.D.N.Y. 2022) (citing *LeSane*, 239 F.3d at 210).

Here, all of the Rule 41(b) factors weigh in favor of dismissing Turcotte's claims in the Turcotte Action. On October 26, 2022, Judge Rochon ordered Turcotte to either retain new counsel or file a notice of *pro se* appearance by November 25, 2022. (No. 21-CV-9182, Dkt. 89.) Turcotte was served with that Order the same day. (No. 21-CV-9182, Dkt. 90.) Not only did he fail to meet the Court's deadline; in the eight months since then, he has failed to appear at all and has done nothing to advance his claims (or defend against the instant motion).

Both before and during those eight months, Turcotte received ample notice that his failure to pursue his claims could lead to their dismissal. On July 17, 2022, he was notified that a bench trial was scheduled to begin on February 13, 2023. (No. 21-CV-9182, Dkt. 74.) On October 4,

2022, after the case reassigned to Judge Rochon, he was notified again that the trial would commence on that date. (No. 21-CV-9182, Dkt. 84.) On December 19, 2022, Judge Rochon explicitly warned him that "[f]ailure to retain counsel or file a notice of appearance in [the Turcotte Action] during the pending of the motion for a default judgment may result in dismissal of Plaintiff's claims for failure to prosecute." (No. 21-CV-9182, Dkt. 95.) And on January 30, 2023, Global served Turcotte with its motion papers, which explicitly sought (in addition to a default judgment on its own claims) the dismissal of the Complaint in the Turcotte Action, with prejudice, due to Turcotte's failure to prosecute those claims. (No. 21-CV-9182, Dkt. 101.) Throughout this period, Turcotte did nothing, in a "complete abdication of any intention to further prosecute the [Turcotte Action]." *Streetbrains.com, LLC v. Lyris, Inc.*, 2011 WL 1483967, at *2 (S.D.N.Y. Apr. 18, 2011).

Prejudice to Global may be presumed, as a matter of law, from Turcotte's abrupt abdication of his responsibilities as a party to this action. *Cannon*, 2023 WL 4157173, at *1; *see also Europacific Asset Mgmt. Corp. v. Tradescape, Corp.*, 233 F.R.D. 344, 353 (S.D.N.Y. 2005) ("Where, as here, [plaintiff's] delay is unreasonable, prejudice may be presumed as a matter of law.") (citing *Peart v. City of New York*, 992 F.2d 458, 462 (2d Cir. 1993)). Moreover, the timing of Turcotte's decision (less than four months before trial) meant that Global's considerable litigation efforts were wasted. Lastly, given that Turcotte has ignored the Court's orders and Global's filings for more than eight months, it is clear that "no lesser sanction than dismissal would effectively address his failure to prosecute." *Garcia v. Thomas*, 2023 WL 3354757, at *4 (S.D.N.Y. Apr. 25, 2023), *report and recommendation adopted*, 2023 WL 3346789 (S.D.N.Y. May 10, 2023); *see also Diaz v. Jacquez*, 2023 WL 3976664, at *2 (S.D.N.Y. June 13, 2023) (claimant's persistent "failure to prosecute and . . . failures to appear at court-ordered conferences demonstrate

that any lesser sanction would be 'an exercise in futility'") (quoting *Edwards v. Horn*, 2012 WL 1292672, at *2 (S.D.N.Y. Apr. 13, 2012), *report and recommendation adopted*, 2012 WL 1592196 (S.D.N.Y. May 4, 2012)). In this case, moreover, dismissal with prejudice is appropriate, as Turcotte cost Global a great deal of time and money before making what was clearly a deliberate decision to ignore both of the related cases before this Court. *See*, *e.g.*, *Am. Petroleum & Transp., Inc. v. M/Y Moca*, 2023 WL 4585050, at *2 (S.D.N.Y. July 18, 2023) (dismissal with prejudice is appropriate where plaintiff was repeatedly warned and proceeded to abandon the litigation); *King v. Demars*, 2023 WL 4446654, at *1 (N.D.N.Y. July 11, 2023) ("as Defendant's motion expressly seeks dismissal with prejudice . . . , Plaintiff was provided notice that failure to prosecute . . . may result in dismissal with prejudice").

## III.  CONCLUSION

For the reasons set forth above, I respectfully recommend, as to the Global Action:

(i)     That Global's motion for a default judgment (Dkt. 155) be GRANTED;

(ii)    That judgment on Counts I and VII of the FAC (for breach of the DTSA and the DMCA, respectively) be entered in favor of Global and against all three Defendants;

(iii)   That Global be awarded $20,197,500 in statutory damages under the DMCA, assessed jointly and severally against all Defendants, together with post-judgment interest at the statutory rate;

(iv)    That a permanent injunction be entered against Defendants, restraining and enjoining each of them, and all those acting in concert with them, from collecting, reverse-engineering, copying, duplicating, sharing, re-posting, republishing (including to any website or social media account), or otherwise disseminating,

whether in its original form or in a modified form, any data, information, or images

obtained or derived from plaintiff's website or from the App; and

(v)    That Global's remaining claims be dismissed.

I further recommend, as to the Turcotte Action, that Global's motion (No. 21-CV-9182, Dkt. 98) be GRANTED IN PART AND DENIED IN PART. Specifically, Global's motion for a default judgment on its counterclaims should be denied, and Global's Rule 41(b) motion should be granted. As a result, all claims and counterclaims in the Turcotte Action should be dismissed.

Global is directed to promptly serve a copy of this Report and Recommendation on Turcotte, Armstrong, and PMD at their last known mailing addresses, and to file proof of such service on the docket of each action.

Dated: August 15, 2023
       New York, New York

BARBARA MOSES
United States Magistrate Judge

## NOTICE OF PROCEDURE FOR FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

The parties shall have fourteen days from the service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. *See also* Fed. R. Civ. P. 6(a), (d). A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the Hon. Jennifer L. Rochon at 500 Pearl Street, New York, NY 10007. Any request for an extension of time to file objections must be directed to Judge Rochon. **Failure to file timely objections will result in a waiver of such objections and will preclude appellate review.** *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Frydman v. Experian Info. Sols., Inc.*, 743 F. App'x 486, 487 (2d Cir. 2018) (summary order); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010).